# 11-2531-cv

IN THE

# United States Court of Appeals

### FOR THE SECOND CIRCUIT



ANAND DASRATH,

*Plaintiff-Appellant,*

*v.*

ROSS UNIVERSITY SCHOOL OF MEDICINE,

*Defendant-Appellee.*

———————————

*On Appeal from the United States District Court
for the Eastern District of New York (Brooklyn)*

## BRIEF AND SPECIAL APPENDIX
## FOR PLAINTIFF-APPELLANT

COSTELLO & COSTELLO, P.C.
*Attorneys for Plaintiff-Appellant*

ARNOLD E. DIJOSEPH, P.C.
*Appellate Counsel*
50 Broadway, Suite 1601
New York, New York 10004
212-344-7858

*Of Counsel:*

Arnold E. DiJoseph

**Table of Contents**

Page

Table of Authorities ...................................................................................iii

Preliminary Statement.................................................................................. 1

Statement of Subject Matter and Appellate Jurisdiction ................................ 4

Questions Presented .................................................................................... 5

Statement of the Case................................................................................... 6

Statement of the Facts ................................................................................. 7

Summary of the Argument ......................................................................... 16

ARGUMENT

POINT I

THE STANDARD OF REVIEW FOR A SUMMARY JUDGMENT MOTION IS DE NOVO, WITH THE FACTS VIEWED IN THE LIGHT MOST FAVORABLE TO THE NON-MOVING PARTY, DRAWING ALL REASONABLE INFERENCES AND RESOLVING ANY AMBIGUITIES IN THE NON-MOVING PARTY'S FAVOR................................................. 17

POINT II

UNDER THE APPLICABLE LAW, AN IMPLIED CONTRACT ARISES BETWEEN A STUDENT AND A UNIVERSITY ONCE THE STUDENT IS ADMITTED, AT WHICH TIME THE TERMS OF CONTRACT ARE ESTABLISHED BY THE SCHOOL'S BULLETINS, CIRCULARS, CATALOGUES AND HANDBOOKS; AND IT IS WELL ESTABLISHED PURSUANT TO THIS IMPLIED CONTRACT, HAVING ADOPTED RULES OR GUIDELINES AS TO THE PROCEDURES TO BE FOLLOWED IN RELATION TO SUSPENSION OR EXPULSION OF A STUDENT, COLLEGES OR UNIVERSITIES (BOTH PUBLIC AND

PRIVATE) MUST SUBSTANTIALLY COMPLY WITH THOSE RULES AND GUIDELINES UNDER THE NEW YORK STATE LAW REGARDING THE ABOVE ........................................................................... 18

POINT III

THE DISTRICT COURT ERRED IN GRANTING SUMMARY JUDGMENT, AS MR. DASRATH SUBMITTED EVIDENCE OF RESPONDENT'S SPECIFIC VIOLATIONS OF ITS INTERNAL REGULATIONS AND PROCEDURES AS SET FORTH IN ITS OWN STUDENT HANDBOOK, AND MR. DASRATH WAS ENTITLED TO HAVE AN ADVERSE INFERENCE DRAWN IN HIS FAVOR FOR PURPOSES OF THE MOTION BASED ON THE DEFENDANTS' FAILURE TO DISCLOSE RELEVANT EVIDENCE ................................... 25

CONCLUSION ............................................................................................... 43

## TABLE OF AUTHORITIES

### CASES

Page

3Com Corp. v. Banco do Brasil, S.A., 171 F.3d 739, 743 (2nd Cir. 1999) .................. 19

American Fuel Corp. v. Utah Energy Development Co., Inc., 122 F.3d 130, 134 (2nd Cir. 1997) ...................................................................... 19

British Intern. Ins. Co. Ltd. v. Seguros La Republica, S.A., 342 F.3d 78, 81 (2nd Cir. 2003) ......................................................................................... 18-19

Byrnie v. Town of Cromwell, Bd. of Ed., 243 F.3d 93 (2nd Cir. 2001) ...... 26, 29-30, 41

Clarke v. Trustees of Columbia University of City of New York, 1996 WL 609271*5-6  (S.D.N.Y. October 23, 1996) ................................................ 20, 21, 41

Eidlisz v. New York University, 61 A.D.3d 473, 475, 876 N.Y.S.2d 400, 401-402 (1st Dep't 2009) .......................................................... 20, 21, 22, 41

Glover v. Costco Wholesale Corp., 153 Fed.Appx. 774, 776 (2nd Cir. 2005) ...... 33-34

Katzman v. Citibank, 298 Fed.Appx. 81, 81-82 (2nd Cir. 2008) .................................... 18

Keefe v. New York Law School, 71 A.D.3d 569, 570, 897 N.Y.S.2d 94, 95 (1st Dep't 2010) ........................................................................................ 20, 21, 41

Kronisch v. U.S., 150 F.3d 112, 126-128 (2nd Cir. 1998) .................................... 26-29, 41

Maas v. Cornell University, 94 N.Y.2d 87, 94-95, 699 N.Y.S.2d 716, 720, 721 N.E.2d 966, 970 (1999) ........................................................................... 23, 41

McConnell v. Le Moyne College, 25 A.D.3d 1066, 1068-1069, 808 N.Y.S.2d 860, 862 (4th Dep't 2006) ........................................................................ 23

Radin v. Albert Einstein College of Medicine of Yeshiva University, 2005 WL 1214281*9  (S.D.N.Y. May 20, 2005) .......................................... 20, 21, 23, 25, 41

Town of Southold v. Town of East Hampton, 477 F.3d 38 (2nd Cir. 2007) ................ 18

Tucker v. New York City, 376 Fed.Appx. 100, 102 (2nd Cir. 2010) ................. 25, 26, 41

Tufariello v. Long Island R. Co., 458 F.3d 80, 85 (2nd Cir. 2006) ................................. 18

Weidemann v. State University of New York College at Cortland, 188 A.D.2d 974, 975-976, 592 N.Y.S.2d 99, 101 (3d Dep't 1992) ................................................ 23-24, 25, 41

Wood v. Pittsford Central Sch. Ds., 2008 WL 5120494 (2nd Cir. 2008) .... 26, 31-32, 41

## **PRELIMINARY STATEMENT**

For the reasons and authorities set forth below, plaintiff-appellant Anand Dasrath ("Mr. Dasrath") respectfully requests that the judgment in this matter be reversed, defendant-respondent's motion for summary judgment be denied, the action be restored and remanded for trial, and costs granted to the Appellant.

Mr. Dasrath respectfully asserts that the District Court erred in granting the defendant-respondent's motion for summary judgment as issues of fact exist as to whether respondent breached specifically indentified terms of respondent's handbook, relating to the registration process, the requirement of a formal review and notice of the right to a hearing when review of a grade is requested, and the propriety of respondent's "administrative withdrawal" of Mr. Dasrath during a scheduled 17 week break during which the handbook expressly indicated he was considered "fully enrolled" and while he was in the process of sitting for his boards.

As will be demonstrated, New York state courts have recognized that an implied contract arises between a student and a university once the student is admitted to the university. Under New York State law, "specific promises set forth in a school's bulletins, circulars and *handbooks*, which are material to the student's relationship with the school, can establish the

1

existence of an implied contract [citations omitted]." Among the rights held to be enforceable pursuant to this implied contract, "'when a university has adopted a rule or guideline establishing the procedure to be followed in relation to suspension or expulsion that procedure must be substantially observed' [citations omitted]."

"[V]iewing the facts in the light most favorable to the non-moving party, drawing all reasonable inferences and resolving any ambiguities in the non-moving party's favor", Mr. Dasrath has submitted evidence tending to prove that (1) respondent's June 22, 2006 administrative withdrawal letter, de-enrolling Mr. Dasrath for failing to "either be registered for courses and/or registered for the Boards", both during a 17 week break period in which he was "fully enrolled" according to the terms of the handbook, and while he was sitting for his boards; (2) respondent's failure to perform the requested grade review until ordered by the court to do so more than 18 months later, and non-compliance with the FERPA requirements adopted by respondent's handbook in failing to invite Mr. Dasrath to said review as well as the failure of the resulting report to "advise the student of his or her right to a hearing regarding the request for amendment"; and (3) respondent's failure to produce Mr. Dasrath's test results despite both a request in 2006

and a formal demand during the course of the subsequent litigation, each violated specifically identified terms of respondent's handbook.

The District Court further erred in granting summary judgment to respondent, in light of the adverse inference it should have drawn due to respondent's failure to produce Mr. Dasrath's actual test papers, which it admitted it maintained and possessed and which it reviewed in January, 2008, long after the action had been commenced. As will be demonstrated, this Honorable Court has held that even where the non-movant's evidence "might not have been sufficient in itself to defeat summary judgment," "such evidence could support a finding of [a meritorious cause of action] because a jury might draw an adverse inference based on the defendants' destruction of relevant evidence."

The respondent's failure to produce Mr. Dasrath's test results despite both a request in 2006 and a formal demand during the course of the subsequent litigation severely prejudiced Mr. Dasrath's ability to oppose respondent's motion, in combination with the above referenced evidence of violations of specific provisions of respondent's handbook gives rise to "an inference of spoliation, [which] in combination with "some (not insubstantial) evidence" for the plaintiff's cause of action [will] allow the plaintiff to survive summary judgment."

3

Based on the foregoing, the judgment of the District Court must be reversed, summary judgment denied and the action restored by this Honorable Court.

## STATEMENT OF SUBJECT MATTER AND APPELLATE JURISDICTION

References to the Joint Appendix herein will be made via the letter "A" followed by the page number therein in parentheses. Pursuant to §1331 of the Judicial Code and 28 U.S.C. § 1332, the District Court held subject matter jurisdiction over the underlying matter as diversity of citizenship exists between the parties and the amount in controversy exceeds $75,000 (A61-A62).

This appeal is from a final judgment entered on May 26, 2011, in the United States District Court for the Eastern District of New York in favor of the respondent and against the Mr. Dasrath, upon the Memorandum and Order of the Honorable Carol Bagley Amon dated May 26, 2011, granting the respondent's motion for summary judgment. (A737; A750).

Mr. Dasrath filed his Notice of Appeal on June 21, 2011 pursuant to Federal Rules of Appellate Procedure 3 within the time prescribed by Federal Rules of Appellate Procedure 4(a) (A751). Accordingly, this Court has jurisdiction to hear Mr. Dasrath's appeal.

## QUESTIONS PRESENTED

1. Whether the District Court erred in granting the respondent's motion for summary judgment, as Mr. Dasrath raised issues of fact as to whether respondent breached specifically indentified terms of respondent's handbook relating to the registration process, the requirement of a formal review and notice of the right to a hearing when review of a grade is requested, and the propriety of respondent's "administrative withdrawal" of Mr. Dasrath for failing to "either be registered for courses and/or registered for the Boards" in the midst of a scheduled 17 week break during which the handbook indicated he was "fully enrolled" and while he was in the process of sitting for his boards?

2. Whether the District Court erred in granting the respondent's motion for summary judgment in light of the respondent's failure to produce Mr. Dasrath's actual test papers, as even where the non-movant's evidence "might not have been sufficient in itself to defeat summary judgment," "such evidence could support a finding of [a meritorious cause of action] because a jury might draw an adverse inference based on the defendants' destruction of relevant evidence"?

5

## STATEMENT OF THE CASE

A.    Nature of the Case

This is an action sounding in breach of the implied contract existing between Mr. Dasrath, a student and respondent, a medical school, as recognized and existing under New York State law.

B.    Proceedings in the District Court

Mr. Dasrath commenced this action on June 15, 2007 by filing a complaint in the United States District Court for the Eastern District of New York (A51).   Upon receiving leave to replead, Mr. Dasrath filed an Amended Complaint dated June 17, 2009 (A61).  By Order dated May 6, 2010, District Judge Carol Bagley Amon granted the respondent's motion to dismiss all of Mr. Dasrath's causes of action except the cause of action sounding in breach of contract (A114).

Following completion of all discovery, on March 3, 2007, the respondent moved for summary judgment on the surviving breach of contract claim (A283).  District Court Judge Carol Bagley Amon issued an order granting summary judgment in favor of respondent, holding that Mr. Dasrath failed to raise triable issues of fact on his breach of contract cause of action (A737).   Judgment pursuant to the memorandum and order was

entered on May 26, 2011 (A750). The order granting summary judgment and resultant judgment is the subject of the appeal before this Court.

## STATEMENT OF THE FACTS

On April 22, 2006, Mr. Dasrath was informed via a website on the internet (in violation of the privacy provisions of FERPA as expressly adopted by respondent at page 25 of its handbook [A98]), that he had failed the AICM course he competed on April 7, 2006 (A41). However, the e-mail notifying Mr. Dasrath that his grades were available on the subject website, listing the grade distribution, did not indicate that any student in the class had received a failing grade (A137). Mr. Dasrath immediately sought to challenge the failing grade as incorrect and inaccurate (A41-A42, A137).

Respondent's handbook sets forth the right to request amendment of a student's education records, including his grade transcripts, the student believes are inaccurate, as follows:

> "Students may ask the University to amend a record that they believe is inaccurate. They should write to the University Registrar, clearly identify the part of the record they want corrected, and specify why it is inaccurate.
>
> If the University decides not to amend the record as requested by the student, the University will notify the student of the decision and advise the student of his or her right to a hearing regarding the request for amendment. Additional information regarding the hearing procedures will be provided when the student is notified of the right to a hearing."

7

A98.

Respondent's handbook further provides for a student's right to inspect and review his education records:

> "The right to inspect and review the student's education record within 45 days of the day the University receives a request for access.
>
> Students should submit to the University Registrar a written request that identifies the records they wish to inspect. The registrar will make arrangements for access and notify the student of the time and place where the record may be inspected."

A98.

In order to effectively challenge the failing grade during the review and hearing Mr. Dasrath was entitled to under the terms of the respondent's handbook (A98), in writing, on April 22, 2006 and May 15, 2006, Mr. Dasrath requested copies of his actual scantron test results and that Dr. Perri review the grade as inaccurate (A42, A44, A137, A313, A688, A700). Respondent's employee Nancy A. Perri, M.D. admitted the respondent maintains these scantron grade sheets (A568) and that she reviewed these test results on January 24, 2008 (A123), so said test results were obviously still in existence more than six months after the action was filed on June 17, 2007 (A1). Despite a follow up request for the test results in a formal demand during the course of the subsequent litigation (A152), the test results were never produced for Mr. Dasrath's review (A26, A686-A687).

8

Despite Mr. Dasrath's written request for a review of his grade (A137, A686), respondent never performed a formal grade review (A686, A688). Additionally, respondent neither advised Mr. Dasrath of a right to a hearing nor scheduled a hearing (A686).

On January 9, 2008, the Honorable Judge Ramon Reyes ordered respondent's employee Dr. Perri to review the allegedly failing AICM grade (A700). The purported review Dr. Perri performed on January 24, 2008 (A123) failed to comply with the FERPA requirements adopted by respondent at page 25 of its handbook (A98), as Mr. Dasrath was not invited to said review (A700). The extremely brief written report (A123) respondent issued failed to "advise the student of his or her right to a hearing regarding the request for amendment" as required by the handbook (A98). The report did not provide "[a]dditional information regarding the hearing procedures" as is required "when the student is notified of the right to a hearing." (A98).

By Administrative Withdrawal Letter issued June 29, 2006, respondent "de-enrolled" Mr. Dasrath "for failure to register for the May 2006 AICM course." (A170). The rationale for the de-enrollment in said letter was as follows:

> "In order for a student to remain enrolled with RUSM, they must either be registered for courses and/or registered for the Boards. Once

9

a student becomes inactive, they are Administratively Withdrawn from RUSM."

A170.

However, respondent's handbook provides as follows:

"Following the 12-week AICM, there is a 17-week scheduled break during which students remain fully enrolled."

A172. Mr. Dasrath's AICM course ended April 7, 2006 (A29, A39), and the June 29, 2006 letter administratively withdrawing him for failing to be enrolled was within the 17 week period during which, according to the handbook, "students remain fully enrolled." (AA688-689).

Additionally, as the June 29, 2006 letter administratively withdrawing Mr. Dasrath indicated, the Handbook states that to be enrolled, a student "must either be registered for courses and/or registered for the Boards." (A170). With respondent's express approval, the period Mr. Dasrath was registered to take his boards between May 1, 2006 and September 30, 2006 (A174-A177), and he actually sat for the exam on July 27, 2006 (A176). Thus, the respondent breached this express term of its handbook in administratively withdrawing Mr. Dasrath (A170, A172).

Respondent seeks to circumvent the express terms of its student handbook by claiming, in a memorandum dated and allegedly placed in Mr. Dasrath's record on April 24, 2006 (but which first surfaced on November

10

22, 2006 [A43] in the course of underlying state court litigation dismissed for lack of personal jurisdiction), that "Dr. Fernandez told Dasrath he would have to repeat the semester," (A33, A138), claiming that this rendered his purported "failure to register for the May 2006 AICM course" grounds for administrative withdrawal (A170).

This memorandum in question, allegedly made a part of his record on April 24, 2006, which was not provided to Mr. Dasrath until November 22, 2006, violated the terms of FERPA, adopted and set forth at page 25 of the respondent's handbook, requiring that documents be made available to students within 45 days of being placed in said record (A98). This claim is also belied by the fact that respondent certified Mr. Dasrath to take the boards on July 27, 2006 (A176) and this certification was not withdrawn until August 14, 2006 (A178).

Additionally, pursuant to page 18 of the handbook (A91), students in the second phase of the M.D. program like Mr. Dasrath (A702-A703) do not have access to registration procedures, instead they "register through the Office of the Dean of Clinical Sciences in New Jersey" and will be "assigned [courses and clerkships] by the Office of the Dean of Clinical Sciences" (A91). Thus, respondent determined which classes a student is to be registered for, and issued an invoice, upon payment of which the student

11

is registered (A43, A251, A703). The one prior occasion when Mr. Dasrath was issued a failing grade on a course (after initially having been issued a B+ [A37]) and had to retake said class, respondent registered him for the class, issued him an invoice, and upon payment he was registered (A43, A251). Respondent never issued Mr. Dasrath an invoice for the May 2006 AICM course, and, therefore, failed to follow its own established procedures (A43, A251).

Respondent also claimed the failing grade and resulting de-enrollment was in part because Mr. Dasrath failed a "Clinical Clerkship Evaluation" dated June 23, 2006 and stamped June 27, 2006 (A134) – two (2) days prior to the Administrative Withdrawal Letter (A25). The Clinical Clerkship Evaluation indicates that Dr. Fernandez was the instructor, and that the clerkship occurred at "Greater Miami Health Education and Training Center" (A134), a hospital which does not exist (A27, A699), whose address is Dr. Fernandez's penthouse office (A157).

Evidence on the record demonstrates that said Clinical Clerkship Evaluation was fabricated, as respondent's deponent Dr. Fernandez admitted Mr. Dasrath was never enrolled in the Clinical Clerkship course (A26). The respondent's handbook states as follows:

> "Passing the AICM course and USMLE Step 1 are required for continuation into clinical clerkships."

12

A172.  Respondent claims that Mr. Dasrath failed the AICM course (A138), and Mr. Dasrath did not sit for the USMLE Step 1 until July 27, 2006 (A176), so Mr. Dasrath could not have been enrolled in a clinical clerkship.

Further, Dr. Fernandez was asked the following questions, and gave the following answers:

"Q     Was he enrolled in a clinical clerkship?

A      No.

Q     Can you please tell me what a clinical clerkship is?

A      A clinical clerkship is a rotation that follows the successful passing of a step one and is part of the 78 weeks after the fifth semester that a student completes clinical activities at assigned hospitals as part of the 150 weeks required for graduation.

Q     Where would the assigned hospitals be?

A      At any one of our affiliates in the United States and/or Princess Margaret Hospital in Dominica.

Q     Was Mr. Dasrath ever assigned to a hospital for clinical clerkship?

A      No."

A151.

Subsequently, Dr. Fernandez, when confronted with his "Clinical Clerkship evaluation", changed his testimony to now claim that AICM was also a clinical clerkship, but then admitted it was neither a core or elective

13

clinical clerkship, but rather "a clinical experience" (A169). Dr. Fernandez is thus claiming that the "Clinical Clerkship evaluation" is part of the failing grade on the AICM course (A169).

This false testimony is refuted by the fact that the Clinical Evaluation Form expressly requires that it "must be returned within 1 month of completion of the rotation." (A134). The AICM course Dr. Fernandez belatedly claims the "Clinical Clerkship evaluation" was purportedly a part of was completed April 7, 2006 (A29, A39), and the allegedly failing grade was reported to Mr. Dasrath on April 22, 2006 (A41, A138), both dates in excess of two months prior to the June 23, 2006 date this "Clinical Clerkship evaluation" form was filled out (A134, A699) and long after the April 22, 2006 date when Mr. Dasrath was informed he had failed the AICM class.

Mr. Dasrath and respondent moved and cross-moved for summary judgment on his breach of contract claims (A17; A291). Both parties Memoranda of Law cited New York State precedents as setting forth the applicable law (A286-A289; A641-A643). Mr. Dasrath raised the above facts in support of his motion for summary judgment and in opposition to the respondent's motion (A36-A50; A681-A704).

The District Court completely ignored all of Mr. Dasrath's factual claims set forth above, and in granting summary judgment to respondent

14

focused on one tertiary factual assertion, holding no reasonable jury could rule the failing grade was fabricated based on the two certifications to to sit for the USMLE Step 1 exam and the certificate of completion of the AICM course (A747).

The District Court's order failed to address Mr. Dasrath's claims that (1) the May 22, 2006 administrative withdrawal for failing to "either be registered for courses and/or registered for the Boards" violated specifically identified terms of respondent's handbook; (2) respondent's failure to perform the requested grade review until ordered by the court to do so more than 18 months later, and non-compliance with the FERPA requirements adopted by its handbook in failing to invite Mr. Dasrath to said review as well as the failure of the report issued as a result to "advise the student of his or her right to a hearing regarding the request for amendment" violated specifically identified terms of respondent's handbook; (3) respondent's failure to produce Mr. Dasrath's test results despite both a request in 2006 and a formal demand during the course of the subsequent litigation both violated specifically identified terms of respondent's handbook and severely prejudiced Mr. Dasrath's ability to oppose respondent's motion (A745-A749).

The instant appeal timely ensued (A751).

15

## SUMMARY OF THE ARGUMENT

New York state courts have recognized that an implied contract arises between a student and a university once the student is admitted to the university. Under New York State law, "specific promises set forth in a school's bulletins, circulars and *handbooks*, which are material to the student's relationship with the school, can establish the existence of an implied contract [citations omitted]."

Mr. Dasrath respectfully asserts that evidence exists on the record indicating that respondent, (1) failed to perform a formal review of the grade upon his written request, as is expressly required by its handbook; (2) issued a report when it belatedly performed a court ordered review which failed to give notice of the right to a hearing and failed to delineate the procedures to be followed with regard to said hearing, as expressly required by its handbook; (3) de-enrolled Mr. Dasrath, who upon its express approval was sitting for his boards during the 17 week break scheduled by its handbook, for failing to "either be registered for courses and/or registered for the Boards", when the handbook indicates that during the 17 week period "students remain fully enrolled" and with respondent's express approval, Mr. Dasrath was sitting for his boards July 26, 2006. This evidence raises issues of fact exist as to whether respondent breached "specific promises set

16

forth in a school's bulletins, circulars and *handbooks*, which are material to the student's relationship with the school, [establishing] the existence of an implied contract" and "in several respects, respondent failed to substantially comply with its own procedures, prejudicing [Mr. Dasrath]."

Further, because of respondent's refusal to provide Mr. Dasrath with copies of his test papers, obviously relevant to whether or not he actually failed the course, assuming, arguendo, that this evidence "might not have been sufficient in itself to defeat summary judgment," "such evidence could support a finding of [a meritorious cause of action] because *a jury might draw a jury might draw an adverse inference based on the defendants' destruction of relevant evidence*."

Based on the foregoing, the judgment of the District Court must be reversed and Mr. Dasrath's breach of contract action should be reinstated by this Honorable Court.

## **ARGUMENT**

**I.  THE STANDARD OF REVIEW FOR A SUMMARY JUDGMENT MOTION IS DE NOVO, WITH THE FACTS VIEWED IN THE LIGHT MOST FAVORABLE TO THE NON-MOVING PARTY, DRAWING ALL REASONABLE INFERENCES AND RESOLVING ANY AMBIGUITIES IN THE NON-MOVING PARTY'S FAVOR:**

This Honorable Court has set the standard of review for an appeal from an order deciding a summary judgment motion as follows:

17

"We review *de novo* a grant of summary judgment, viewing the facts in the light most favorable to the non-moving party, drawing all reasonable inferences and resolving any ambiguities in the non-moving party's favor. *See Tufariello v. Long Island R.R. Co.,* 458 F.3d 80, 85 (2d Cir.2006). The moving party bears the burden of showing, by competent evidence, that no genuine issue of material facts exists. *See* Fed.R.Civ.P. 56. At the summary judgment stage, a trial court's function is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). While the admissibility of the evidence is for a trial court to decide, disputes about "the validity of the underlying data go to the weight of the evidence and are for the fact-finder to resolve." *Raskin v. Wyatt Co.,* 125 F.3d 55, 66 (2d Cir.1997)."

Katzman v. Citibank, 298 Fed.Appx. 81, 81-82 (2nd Cir. 2008); see Town of Southold v. Town of East Hampton, 477 F.3d 38, 46-47 (2nd Cir. 2007); Tufariello v. Long Island R. Co., 458 F.3d 80, 85 (2nd Cir. 2006).

## II.   UNDER THE APPLICABLE LAW, AN IMPLIED CONTRACT ARISES BETWEEN A STUDENT AND A UNIVERSITY ONCE THE STUDENT IS ADMITTED, AT WHICH TIME THE TERMS OF CONTRACT ARE ESTABLISHED BY THE SCHOOL'S BULLETINS, CIRCULARS, CATALOGUES AND HANDBOOKS; AND IT IS WELL ESTABLISHED PURSUANT TO THIS IMPLIED CONTRACT, HAVING ADOPTED RULES OR GUIDELINES AS TO THE PROCEDURES TO BE FOLLOWED IN RELATION TO SUSPENSION OR EXPULSION OF A STUDENT, COLLEGES OR UNIVERSITIES (BOTH PUBLIC AND PRIVATE) MUST SUBSTANTIALLY COMPLY WITH THOSE RULES AND GUIDELINES UNDER THE NEW YORK STATE LAW REGARDING THE ABOVE:

It is well established by precedents of this Honorable Court that where "[t]he parties agree that New York law governs this diversity case; their 'consent concludes the choice of law inquiry.'" British Intern. Ins. Co. Ltd.

18

v. Seguros La Republica, S.A., 342 F.3d 78, 81 (2nd Cir. 2003); see 3Com

Corp. v. Banco do Brasil, S.A., 171 F.3d 739, 743 (2nd Cir. 1999); American

Fuel Corp. v. Utah Energy Development Co., Inc., 122 F.3d 130, 134 (2nd

Cir. 1997).

In 3Com Corp., 171 F.3d at 743, this Honorable Court held as

follows:

> "Because subject matter jurisdiction in this case is predicated on
> diversity of citizenship, we would ordinarily be guided by the choice-
> of-law principles of the forum state, which in this case is New York,
> *see Klaxon Co. v. Stentor Elec. Mfg. Co.,* 313 U.S. 487, 496, 61 S.Ct.
> 1020, 85 L.Ed. 1477 (1941); *Krock v. Lipsay,* 97 F.3d 640, 645 (2d
> Cir.1996), and in turn these principles might, under some
> circumstances, direct us to apply the substantive law of a jurisdiction
> other than New York. However, the parties rely exclusively on New
> York substantive law, and "where the parties have agreed to the
> application of the forum law, their consent concludes the choice of
> law inquiry." *American Fuel Corp. v. Utah Energy Dev. Co.,* 122 F.3d
> 130, 134 (2d Cir.1997)."

Id.

Thus, the District Court correctly held that as both parties "treat New

York law as governing this dispute. The Court accepts that agreement." See

id.; British Intern. Ins. Co. Ltd., 342 F.3d at 81; American Fuel Corp., 122

F.3d at 134.

"New York state courts have recognized that an implied contract

arises between a student and a university once the student is admitted to the

university. *See Chira v. Columbia Univ.,* 289 F.Supp.2d 477, 485

(S.D.N.Y.2003); *Mostaghim v. Fashion Inst. of Tech.,* No. 01 Civ. 8090, 2002 WL 1339098, at *6 (S.D.N.Y. June 19, 2002); *Ward v. New York Univ.,* No. 99 Civ. 8733, 2000 WL 1448641, at *3 (S.D.N.Y. Sept. 28, 2000); *Gally v. Columbia Univ.,* 22 F.Supp.2d 199, 206 (S.D.N.Y.1998) (citing *Clarke v. Trustees of Columbia Univ.,* No. 95 Civ. 10627, 1996 WL 609271, at *5 (S.D.N.Y. Oct. 23, 1996)); *Keles v. New York Univ.,* No. 91 Civ. 7457, 1994 WL 119525, at *4-5 (S.D.N.Y. Apr. 6, 1994), *aff'd,* 54 F.3d 766 (2d Cir.1995), *cert. denied,* 516 U.S. 943 (1995); *Ansari v. New York Univ.,* No. 96 Civ. 5280, 1997 WL 257473, at *3 (S.D.N.Y. May 16, 1997) (citing *Paladino v. Adelphi Univ.,* 89 A.D.2d 85, 454 N .Y.S.2d 868 (2d Dep't 1982)); *Olsson v. Bd. of Higher Educ.,* 49 N .Y.2d 408, 413-14 (N.Y.1980); *Vought v. Teachers Coll., Columbia Univ.,* 127 A.D.2d 654, 511 N.Y.S.2d 880, 881 (2d Dep't 1987))." Radin v. Albert Einstein College of Medicine of Yeshiva University, 2005 WL 1214281*9   (S.D.N.Y. May 20, 2005); see Clarke v. Trustees of Columbia University of City of New York, 1996 WL 609271*5-6  (S.D.N.Y. October 23, 1996); Keefe v. New York Law School, 71 A.D.3d 569, 570, 897 N.Y.S.2d 94, 95 (1st Dep't 2010); Eidlisz v. New York University, 61 A.D.3d 473, 475, 876 N.Y.S.2d 400, 401-402 (1st Dep't 2009).

Under New York State law, "specific promises set forth in a school's bulletins, circulars and *handbooks*, which are material to the student's relationship with the school, can establish the existence of an implied contract (*see Lloyd v. Alpha Phi Alpha Fraternity,* 1999 WL 47153, *9–10, 1999 U.S. Dist. LEXIS 906, *25–28 [N.D.N.Y.1999]; *see also Abraham v. New York Univ. Coll. of Dentistry,* 190 A.D.2d 567, 593 N.Y.S.2d 229 [1993])." Keefe, 71 A.D.3d at 570, 897 N.Y.S.2d at 95; see Radin, 2005 WL 1214281 at *9; Clarke, 1996 WL 609271 at *5-6; Eidlisz, 61 A.D.3d at 475, 876 N.Y.S.2d at 401-402.

In Clarke, 1996 WL 609271 at *5, the United States District Court delineated New York State law on the subject as follows:

> "Dismissal pursuant to Rule 12(b)(6) is not appropriate, however, with respect to the contract claims because, whereas claims for educational malpractice cannot succeed under New York law, *New York courts have suggested that a student can sue a school for breach of contract. See Paladino,* 89 A.D.2d at 92, 454 N.Y.S.2d at 873. According to this line of cases, *when a student is admitted to a school, an implied contract arises between the student and the school. See Olsson,* 49 N.Y.2d at 414, 402 N.E.2d at 1153, 426 N.Y.S.2d at 251 (noting, without clearly adopting or rejecting, the view suggested in *Carr v. St. John's Univ.,* 17 A.D.2d 632, 633, 231 N.Y.S.2d 410, 413, *aff'd,* 12 N.Y.2d 802, 187 N.E.2d 18, 235 N.Y.S.2d 834 (1962), that an implied contract exists). *The terms of such an implied contract are "contained in the [school's] bulletins, circulars and regulations made available to the student." Vought v. Teachers College, Columbia University,* 127 A.D.2d 654, 655, 511 N.Y.S.2d 880, 881 (1987)."

Id. (emphasis added).

In Eidlisz, 61 A.D.3d at 475, 876 N.Y.S.2d at 401-402, the New York State Appellate Division held that a student stated a breach of contract cause of action against his university upon demonstrating that said university failed to follow its own written guidelines, contained in its handbook, concerning registration, payment of tuition, and notification of de-enrollment:

> "Contrary to Supreme Court's conclusion that this case "relates to the sort of academic and administrative decisions that ... are properly the subject of an article 78 proceeding, rather than an action for breach of contract," "*there exists an implied contract between the institution and its students such that if the student complies with the terms prescribed by the institution, he will obtain the degree which he sought*" (*Matter of Olsson v. Board of Higher Educ. of City of N.Y.,* 49 N.Y.2d 408, 414, 426 N.Y.S.2d 248, 402 N.E.2d 1150 [1980] [internal quotation marks and brackets omitted]).

> Plaintiff properly brought this action for breach of contract, rather than an article 78 proceeding, because, in the school's July 18, 2002 letter, *he was promised that he would be billed per credit and would obtain a degree upon completion of the three courses; however, the school failed to bill plaintiff as promised, failed to correct the tuition bill in a timely manner, failed to notify plaintiff of his de-enrollment by e-mail in accordance with its handbook's announced preference for e-mail*, and failed to grant plaintiff a degree when he paid the correct amount of tuition in full."

Id. (emphasis added).

Among the rights held to be enforceable pursuant to this implied contract, "'when a university has adopted a rule or guideline establishing the procedure to be followed in relation to suspension or expulsion that

procedure must be substantially observed' (*id.,* at 660, 427 N.Y.S.2d 760, 404 N.E.2d 1302)." Maas v. Cornell University, 94 N.Y.2d 87, 94-95, 699 N.Y.S.2d 716, 720, 721 N.E.2d 966, 970 (1999); see Radin, 2005 WL 1214281 at *11; McConnell v. Le Moyne College, 25 A.D.3d 1066, 1068-1069, 808 N.Y.S.2d 860, 862 (4th Dep't 2006); Weidemann v. State University of New York College at Cortland, 188 A.D.2d 974, 975-976, 592 N.Y.S.2d 99, 101 (3d Dep't 1992).

In Weidemann, 188 A.D.2d at 975-976, 592 N.Y.S.2d at 101, the New York State Appellate Division held as follows:

> "It is well established that once *having adopted rules or guidelines establishing the procedures to be followed in relation to suspension or expulsion of a student, colleges or universities-both public and private-must substantially comply with those rules and guidelines* (*see, Tedeschi v. Wagner Coll.,* 49 N.Y.2d 652, 660, 427 N.Y.S.2d 760, 404 N.E.2d 1302; *see also, Matter of Harris v. Trustees of Columbia Univ.,* 62 N.Y.2d 956, 479 N.Y.S.2d 216, 468 N.E.2d 54, *revg. on dissenting mem below* 98 A.D.2d 58, 70, 470 N.Y.S.2d 368; *Stone v. Cornell Univ.,* 126 A.D.2d 816, 817, 510 N.Y.S.2d 313; *Matter of Galiani v. Hofstra Univ.,* 118 A.D.2d 572, 499 N.Y.S.2d 182). In the instant case, respondent has *established clear rules to be followed* in cases concerning alleged academic dishonesty, which it published *in its 1988-1990 Cortland College Handbook* supplied to petitioner along with the notice of charges against him. We conclude that, in several respects, respondent failed to substantially comply with its own procedures, prejudicing petitioner."

Id. (emphasis added). The Appellate Division held that failure to provide a student with access to evidence necessary to address the grounds for dismissal from the school was "most prejudicial":

"As an initial and most *prejudicial matter*, petitioner did not receive the required five-day advance written notice of the supporting evidence, in violation of Handbook §§ 340.03 and 340.05. Indeed, *petitioner was not even aware until the hearing was in progress of the existence of the first letter from Root* concerning his observations of the charged conduct, which was used as evidence against petitioner. *He had no meaningful opportunity to prepare to defend against that evidence*. Further, the Tribunal contacted Root days after the hearing, posing additional questions regarding the allegations, and accepted a second letter from Root in response. Petitioner first learned of that phone call and letter when he received the Tribunal's report to the Provost recommending expulsion. Petitioner thus not only did not receive a copy of the supporting evidence five days in advance of the hearing, he had absolutely no opportunity to rebut or explain this evidence, as was his right under Handbook § 340.05(7)."

Id. (emphasis added).

As will be demonstrated, infra, at point III, the respondent, (1) failed to perform a formal review of the grade upon his written request, as is expressly required by its handbook; (2) issued a report when it belatedly performed a court ordered review which failed to give notice of the right to a hearing and failed to delineate the procedures to be followed with regard to said hearing, as expressly required by its handbook; (3) de-enrolled Mr. Dasrath, who upon its express approval was sitting for his boards during the 17 week break scheduled by its handbook, for failing to "either be registered for courses and/or registered for the Boards", when the handbook indicates that during the 17 week period "students remain fully enrolled" and with respondent's express approval, Mr. Dasrath was sitting for his boards July

24

26, 2006. This evidence raises issues of fact exist as to whether respondent breached "specific promises set forth in a school's bulletins, circulars and *handbooks*, which are material to the student's relationship with the school, [establishing] the existence of an implied contract" and "in several respects, respondent failed to substantially comply with its own procedures, prejudicing [Mr. Dasrath]." See Radin, 2005 WL 1214281 at *9; Weidemann, 188 A.D.2d at 975-976, 592 N.Y.S.2d at 101.

Further, the evidence shows that respondent failed or refused to provide Mr. Dasrath with copies of his test papers, obviously relevant to whether or not he actually failed the course. As will be demonstrated, infra at Point III, assuming, *arguendo*, that this evidence "might not have been sufficient in itself to defeat summary judgment," "such evidence could support a finding of [a meritorious cause of action] because *a jury might draw a jury might draw an adverse inference based on the defendants' destruction of relevant evidence*." See Tucker v. New York City, 376 Fed.Appx. 100, 102 (2nd Cir. 2010).

**III. THE DISTRICT COURT ERRED IN GRANTING SUMMARY JUDGMENT, AS MR. DASRATH SUBMITTED EVIDENCE OF RESPONDENT'S SPECIFIC VIOLATIONS OF ITS INTERNAL REGULATIONS AND PROCEDURES AS SET FORTH IN ITS OWN STUDENT HANDBOOK, AND MR. DASRATH WAS ENTITLED TO HAVE AN ADVERSE INFERENCE DRAWN IN HIS FAVOR FOR PURPOSES OF**

**THE MOTION BASED ON THE DEFENDANTS' FAILURE TO DISCLOSE RELEVANT EVIDENCE:**

As recently as May 10, 2010, this Honorable Court has held that even where the non-movant's evidence "might not have been sufficient in itself to defeat summary judgment," "such evidence could support a finding of [a meritorious cause of action] because *a jury might draw an adverse inference based on the defendants' destruction of relevant evidence*." Tucker, 376 Fed.Appx. at 102; see Wood v. Pittsford Central School Dist., 2008 WL 5120494*2-3 (2nd Cir. 2008); Byrnie v. Town of Cromwell, Bd. of Educ., 243 F.3d 93, 107-108 (2nd Cir. 2001); Kronisch v. U.S., 150 F.3d 112, 126-128 (2nd Cir. 1998).

In Kronisch, 150 F.3d at 126-128, this Honorable Court held that "a jury should be permitted (but not required) to draw an adverse inference against [a movant] based on the destruction of [relevant] documents" and " when combined with the possibility that a jury would choose to draw such an adverse inference, plaintiff's circumstantial evidence . . . was enough. . . to entitle him to proceed to trial":

> "A discussion of whether Glickman has produced sufficient evidence to survive summary judgment on his sole timely claim (his *Bivens* claim that Gottlieb was the person who laced his drink with LSD) must begin by focusing on the CIA's destruction of its MKULTRA files in 1973, at the direction of Gottlieb and with the approval of Helms. Although we believe, like the district court, that a jury might be skeptical of plaintiff's claim that he was drugged by Gottlieb, we

26

also believe, contrary to the district court, that *a jury should be permitted (but not required) to draw an adverse inference against Gottlieb based on the destruction of MKULTRA documents. Further, we believe that, when combined with the possibility that a jury would choose to draw such an adverse inference, plaintiff's circumstantial evidence that he may have been one of the victims of the CIA's drug tests was enough-barely enough, but enough nonetheless-to entitle him to proceed to trial*.

It is a well-established and long-standing principle of law that a party's intentional destruction of evidence relevant to proof of an issue at trial can support an inference that the evidence would have been unfavorable to the party responsible for its destruction. *See, e.g., Nation-Wide Check Corp. v. Forest Hills Distributors,* 692 F.2d 214, 217-18 (1st Cir.1982); 2 John Henry Wigmore, *Evidence in Trials at Common Law* § 291 (James H. Chadbourn rev.1979). This adverse inference rule is supported by evidentiary, prophylactic, punitive, and remedial rationales. The evidentiary rationale derives from the common sense notion that a party's destruction of evidence which it has reason to believe may be used against it in litigation suggests that the evidence was harmful to the party responsible for its destruction. The prophylactic and punitive rationales are based on the equally commonsensical proposition that the drawing of an adverse inference against parties who destroy evidence will deter such destruction, and will properly "plac[e] the risk of an erroneous judgment on the party that wrongfully created the risk." *Nation-Wide Check,* 692 F.2d at 218. Finally, courts have recognized a remedial rationale for the adverse inference-namely, that an adverse inference should serve the function, insofar as possible, of restoring the prejudiced party to the same position he would have been in absent the wrongful destruction of evidence by the opposing party. *See Skeete v. McKinsey & Co.,* No. 91 Civ. 8093, 1993 WL 256659, at *5 (S.D.N.Y. July 7, 1993); *Turner v. Hudson Transit Lines, Inc.,* 142 F.R.D. 68, 74 (S.D.N.Y.1991).

In order for an adverse inference to arise from the destruction of evidence, the party having control over the evidence must have had an obligation to preserve it at the time it was destroyed. This obligation to preserve evidence arises when the party has notice that the evidence is relevant to litigation-most commonly when suit has already been

filed, providing the party responsible for the destruction with express notice, but also on occasion in other circumstances, as for example when a party should have known that the evidence may be relevant to future litigation. *See Turner,* 142 F.R.D. at 72-73; *127 *Skeete,* 1993 WL 256659, at *4. Once a court has concluded that a party was under an obligation to preserve the evidence that it destroyed, it must then consider whether the evidence was intentionally destroyed, and the likely contents of that evidence. *See Weinreich v. Sandhaus,* 850 F.Supp. 1169, 1181 n. 19 (S.D.N.Y.1994)."

Id. (emphasis added). This Honorable Court held that "*holding the prejudiced party to too strict a standard of proof regarding the likely contents of the destroyed evidence would subvert the prophylactic and punitive purposes of the adverse inference, and would allow parties who have intentionally destroyed evidence to profit from that destruction*":

"The failure or refusal to produce a relevant document, or the destruction of it, is evidence from which alone its contents may be inferred to be unfavorable to the possessor, *provided the opponent, when the identity of the document is disputed, first introduces some evidence tending to show that the document actually destroyed or withheld is the one* as to whose contents it is desired to draw an inference.

2 Wigmore, *Evidence in Trials at Common Law* § 291, at 228 (emphasis in original).

Wigmore's description of the proper rule was offered in the context of a hypothetical in which a *particular* document ( *e.g.,* a deed meant to show the conveyance of a certain piece of land from X to Y), known by all to contain critical evidence in the case, was destroyed. Where, as here, a party loses the opportunity to identify such a particular document or documents likely to contain critical evidence because the voluminous files that might contain the document(s) have all been destroyed, the situation becomes more complex-but there can be no doubt that the same basic principle proposed by Wigmore still applies.

That is, the prejudiced party may be permitted an inference in his favor so long as he has produced some evidence suggesting that a document or documents relevant to substantiating his claim would have been included among the destroyed files.

Just how much evidence is enough to support an inference about the content of destroyed evidence cannot be precisely defined, and will necessarily vary from case to case, but we remain mindful of Wigmore's admonition that "care should be taken" not to require too specific a level of proof. *Id.* at 228. Indeed, *holding the prejudiced party to too strict a standard of proof regarding the likely contents of the destroyed evidence would subvert the prophylactic and punitive purposes of the adverse inference, and would allow parties who have intentionally destroyed evidence to profit from that destruction.* Certainly, *the level of proof that will suffice to support an inference in favor of the innocent party on a particular issue must be less than the amount that would suffice to survive summary judgment on that issue. Otherwise, innocent parties meant to benefit from the adverse inference against offending parties would receive no benefit at all, having been deprived of evidence that may have been crucial to making their case, and yet being held to precisely the same standard of proof before they may present their case to a jury*."

Id. (emphasis added).

In Byrnie, 243 F.3d at 107-108, this Honorable Court held that "an inference of spoliation, in combination with "some (not insubstantial) evidence" for the plaintiff's cause of action, can allow the plaintiff to survive summary judgment", under circumstances where the movant "had to have had notice of the prospect of potential litigation at the time the [documents in question] were destroyed":

"We have defined spoliation as 'the destruction or significant alteration of evidence, or the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation.' *West*

*v. Goodyear Tire & Rubber Co.,* 167 F.3d 776, 779 (2d Cir.1999). The spoliation of evidence germane 'to proof of an issue at trial can support an inference that the evidence would have been unfavorable to the party responsible for its destruction.' *Kronisch v. United States,* 150 F.3d 112, 126 (2d Cir.1998). This sanction serves a threefold purpose of (1) deterring parties from destroying evidence; (2) placing the risk of an erroneous evaluation of the content of the destroyed evidence on the party responsible for its destruction; and (3) restoring the party harmed by the loss of evidence helpful to its case to where the party would have been in the absence of spoliation. *See West,* 167 F.3d at 779. *In borderline cases, an inference of spoliation, in combination with 'some (not insubstantial) evidence' for the plaintiff's cause of action, can allow the plaintiff to survive summary judgment. Kronisch,* 150 F.3d at 128.

Where one seeks an adverse inference regarding the content of destroyed evidence, one must first show that "the party having control over the evidence ... had an obligation to preserve it at the time it was destroyed." *Kronisch,* 150 F.3d at 126. Such an obligation usually arises when a "party has notice that the evidence is relevant to litigation ... but also on occasion in other circumstances, as for example *when a party should have known that the evidence may be relevant to future litigation*." *Id.* The law in this circuit is not clear on what state of mind a party must have when destroying it. In *Reilly v. Natwest Markets Group Inc.,* we noted that at times we have required a party to have intentionally destroyed evidence; at other times we have required action in bad faith; and at still other times we have allowed an adverse inference based on gross negligence. *See Reilly v. Natwest Mkts. Group Inc.,* 181 F.3d 253, 267 (2d Cir.1999), *cert. denied,* 528 U.S. 1119, 120 S.Ct. 940, 145 L.Ed.2d 818 (2000). In light of this, we concluded a case by case approach was appropriate. *See id.* Finally, a court must determine "whether there is any likelihood that the destroyed evidence would have been of the nature alleged by the party affected by its destruction." *Kronisch,* 150 F.3d at 127. The burden falls on the "prejudiced party" to produce "some evidence suggesting that a document or documents relevant to substantiating his claim would have been included among the destroyed files." *Id.* at 128.

30

The district court dealt with this issue by noting that there was no evidence indicating when the missing documents were destroyed or with what state of mind. *See Byrnie,* 73 F.Supp.2d at 208 n. 8. Nevertheless, *Cromwell had to have had notice of the prospect of potential litigation at the time the notes that formed the basis for Cromwell's CCHRO Answer were destroyed since it is only logical to anticipate that a complaint lodged with the CCHRO might be pursued at a later date in a court room.* The CCHRO Answer, further, promises to make available to the CCHRO "the name or any identifiable information about any [applicants]" if needed-suggesting that applicant information existed at the time the CCHRO Answer was prepared. And, *arguably, Cromwell had notice of potential litigation even earlier*: in October, 1995, Cromwell received a FOIA request seeking materials related to the hiring process, and on August 8, 1995, in a meeting with Nappi and Cassella, Byrnie had expressed concerns about the hiring process and asked for copies of the interview questions. Gere testified that "shortly after the process was completed it became very apparent to us that Mr. Byrnie had concerns," and explained that when the FOIA request was received, he was assured by Nappi that "information" had been "retained." *See Kronisch,* 150 F.3d at 127 (*documents destroyed years before suit brought could reasonably be found to have been destroyed in anticipation of litigation where fear of potential future litigation plausibly motivated the spoliation*)."

Id. (emphasis added).

In Wood, 2008 WL 5120494 at *2-3, decided December 8, 2008, this

Honorable Court held that "for summary judgment purposes, we cannot

foreclose the possibility of an adverse spoliation inference" where a school

"did not keep any records of the projected decreases in student enrollment,

even though these projections constituted the sole justification for [the

complained of action]":

"Finally, *for summary judgment purposes, we cannot foreclose the possibility of an adverse spoliation inference on this record.* "*In borderline cases, an inference of spoliation, in combination with 'some (not insubstantial) evidence' for the plaintiff's cause of action, can allow the plaintiff to survive summary judgment.*" *Byrnie v. Town of Cromwell, Bd. of Educ.,* 243 F.3d 93, 107 (2d Cir.2001) (quoting *Kronisch v. United States,* 150 F.3d 112, 128 (2d Cir.1998)). A spoliation inference is available if: (1) relevant evidence is destroyed; (2) with culpability; (3) when the defendant was under a duty to preserve the evidence. *Id.* at 109. In an employment discrimination action, the duty to preserve can arise from EEOC regulations. *See* 42 U.S.C. § 2000e-8(c); 29 C.F .R. § 1602.14; *Byrnie,* 243 F.3d at 109 (citing *Favors v. Fisher,* 13 F.3d 1235, 1239 (8th Cir.1994); *Hicks v. Gates Rubber Co.,* 833 F.2d 1406, 1419 (10th Cir.1987)). *Here, the District has admitted that hard copies of documents setting forth the enrollment projections for staffing purposes probably were destroyed. This evidence is unquestionably relevant*. . . . The Defendant-Appellee appears to concede that the records were destroyed intentionally, in the sense that their destruction was not an accident. J.A. at 1729. This is enough, at least for summary judgment purposes. *See id.; Byrnie,* 243 F.3d at 109.

Even without invoking the legal doctrine of spoliation, moreover, *the fact remains that the District did not keep any records of the projected decreases in student enrollment, even though these projections constituted the sole justification for advising an employee who had formally complained of discrimination just two business days earlier and who otherwise received favorable reviews that her position might not be renewed*. The jury might conclude that a reasonable employer with legitimate, neutral reasons for terminating an employee under these circumstances would keep some records of the calculations that caused the termination.

The jury, of course, need not view the evidence in the light most favorable to Plaintiff-Appellant, and it may find that the discharge was not retaliatory. *On this record, however, the retaliation claim cannot be dismissed as a matter of law*."

Id. (emphasis added).

In <u>Glover v. Costco Wholesale Corp.</u>, 153 Fed.Appx. 774, 776 (2nd Cir. 2005), this Honorable Court delineated the showing required for an adverse inference on the grounds of spoliation as follows:

> ""Even in the absence of a discovery order, a court may impose sanctions on a party for misconduct in discovery under its inherent power to manage its own affairs." *Residential Funding Corp. v. DeGeorge Fin. Corp.,* 306 F.3d 99, 106-07 (2d Cir.2002). Moreover, where the breach of a discovery obligation is the non-production of evidence, a court has broad discretion to determine the appropriate sanction, which may include giving an adverse-inference instruction. *Id.* at 107. We review the issuance of this instruction for abuse of discretion. *Id.*
>
> *To warrant an adverse-inference instruction for the destruction of evidence, a court must find "(1) that the party having control over the evidence had an obligation to preserve it at a time it was destroyed; (2) that the records were destroyed 'with a culpable state of mind'; and (3) that the destroyed evidence was 'relevant' to the party's claim or defense*." *Id.* A party's "obligation to preserve" evidence, in accordance with prong one,
>
> arises when the party has notice that the evidence is relevant to litigation-most commonly when suit has already been filed, providing the party responsible for the destruction with express notice, but also on occasion in other circumstances, as for example when a party should have known that the evidence may be relevant to future litigation.
>
> *Kronisch v. United States,* 150 F.3d 112, 126 (2d Cir.1998). Prong two's 'culpable state of mind' requirement is satisfied by a showing that the evidence was destroyed either knowingly or negligently. *Residential Funding Corp.,* 306 F.3d at 108. Finally, to satisfy the relevancy requirement of prong three, a party seeking the adverse-inference instruction must adduce sufficient evidence for a trier of fact to infer that the destroyed evidence was of the nature alleged by the party. *Id.* at 109."

33

Id. (emphasis added).

In the instant action, on April 22, 2006, Mr. Dasrath was informed via a website on the internet (in violation of the privacy provisions of FERPA as expressly adopted by respondent at page 25 of its handbook [A98]) that he had failed the AICM course he competed on April 7, 2006 (A41). However, the e-mail notifying Mr. Dasrath that his grades were available on the subject website, listing the grade distribution, did not indicate that any student in the class had received a failing grade (A137). Mr. Dasrath immediately sought to challenge the failing grade as incorrect and inaccurate (A41-A42, A137).

Respondent's handbook sets forth the right to request amendment of a student's education records, including his grade transcripts, the student believes are inaccurate, as follows:

> "Students may ask the University to amend a record that they believe is inaccurate. They should write to the University Registrar, clearly identify the part of the record they want corrected, and specify why it is inaccurate.

> If the University decides not to amend the record as requested by the student, the University will notify the student of the decision and advise the student of his or her right to a hearing regarding the request for amendment. Additional information regarding the hearing procedures will be provided when the student is notified of the right to a hearing."

A98.

34

Respondent's handbook further provides for a student's right to inspect and review his education records:

> "The right to inspect and review the student's education record within 45 days of the day the University receives a request for access.
>
> Students should submit to the University Registrar a written request that identifies the records they wish to inspect. The registrar will make arrangements for access and notify the student of the time and place where the record may be inspected."

A98.

In order to effectively challenge the failing grade, in writing on April 22, 2006 and May 15, 2006, Mr. Dasrath requested copies of his actual scantron test results and that Dr. Perri review the grade as inaccurate (A42, A44, A137, A313, A688, A700). Respondent's employee Nancy A. Perri, M.D. admitted the respondent maintains these scantron grade sheets (A568) and that she reviewed these test results on January 24, 2008 (A123), so said test results were obviously still in existence more than six months after the action was filed on June 17, 2007 (A1). Despite a follow up request for the test results in a formal demand during the course of the subsequent litigation (A152), the test results were never produced for Mr. Dasrath's review (A26, A686-A687).

Despite Mr. Dasrath's request for a review of his grade (A137, A686), respondent never performed a formal grade review (A686, A688).

35

Additionally, respondent neither advised Mr. Dasrath of a right to a hearing nor scheduled a hearing (A686).

On January 9, 2008, the Honorable Judge Ramon Reyes ordered respondent's employee Dr. Perri to review the allegedly failing AICM grade (A700). The purported review Dr. Perri performed on January 24, 2008 (A123) failed to comply with the FERPA requirements adopted by respondent at page 25 of its handbook (A98) as Mr. Dasrath was not invited to said review (A700) and the extremely brief written report (A123) issued as a result failed to "advise the student of his or her right to a hearing regarding the request for amendment" as is required by the handbook (A98). The report also failed to provide "[a]dditional information regarding the hearing procedures" as is further required "when the student is notified of the right to a hearing." (A98).

By Administrative Withdrawal Letter issued June 29, 2006, respondent "de-enrolled" Mr. Dasrath "for failure to register for the May 2006 AICM course." (A170). The rationale for the de-enrollment in said letter was as follows:

> "In order for a student to remain enrolled with RUSM, they must either be registered for courses and/or registered for the Boards. Once a student becomes inactive, they are Administratively Withdrawn from RUSM."

A170.

However, respondent's handbook provides as follows:

"Following the 12-week AICM, there is a 17-week scheduled break during which students remain *fully enrolled*."

A172 (emphasis added). Mr. Dasrath's AICM course ended April 7, 2006 (A29, A39), and the June 29, 2006 letter administratively withdrawing him for failing to be enrolled was within the 17 week period during which, according to the handbook, "students remain fully enrolled." (A688-A689).

Additionally, as the June 29, 2006 letter administratively withdrawing Mr. Dasrath indicated, the Handbook states that to be enrolled, a student "must either be registered for courses and/or registered for the Boards." (A170). With respondent's express approval, the period Mr. Dasrath was registered to take his boards between May 1, 2006 and September 30, 2006 (A174-A177), and he actually sat for, and passed, the exams on July 27, 2006 (A176). Thus, the respondent breached this express term of its handbook in administratively withdrawing Mr. Dasrath (A170, A172).

Respondent seeks to circumvent the express terms of its student handbook by claiming, in a memorandum dated and allegedly placed in Mr. Dasrath's record on April 24, 2006 (but which first surfaced on November 22, 2006 [A43] in the course of underlying state court litigation dismissed for lack of personal jurisdiction), that "Dr. Fernandez told Dasrath he would have to repeat the semester," (A33, A138), claiming that this rendered his

37

purported "failure to register for the May 2006 AICM course" grounds for administrative withdrawal (A170).

This memorandum in question, allegedly made a part of his record on April 24, 2006, which was not provided to Mr. Dasrath until November 22, 2006, violated the terms of FERPA, adopted and set forth at page 25 of the respondent's handbook, requiring that documents be made available to students within 45 days of being placed in said record (A98). This claim is also belied by the fact that respondent certified Mr. Dasrath to take the boards on July 27, 2006 (A176) and this certification was not withdrawn until August 14, 2006 (A178).

Additionally, pursuant to page 18 of the handbook (A91), students in the second phase of the M.D. program like Mr. Dasrath (A702-A703) do not have access to registration procedures, instead they "register through the Office of the Dean of Clinical Sciences in New Jersey" and will be "assigned [courses and clerkships] by the Office of the Dean of Clinical Sciences" (A91). Thus, respondent determined which classes a student is to be registered for, and issued an invoice, upon payment of which the student is registered (A43, A251, A703). The one prior occasion when Mr. Dasrath was issued a failing grade on a course (after initially having been issued a B+ [A37]) and had to retake said class, respondent registered him for the

38

class, issued him an invoice, and upon payment he was registered (A43, A251). Respondent never issued Mr. Dasrath an invoice for the May 2006 AICM course, and, therefore, failed to follow its own established procedures (A43, A251).

Respondent also claimed the failing grade and resulting de-enrollment was in part because Mr. Dasrath failed a "Clinical Clerkship Evaluation" dated June 23, 2006 and stamped June 27, 2006 (A134) – two (2) days prior to the Administrative Withdrawal Letter (A25). The Clinical Clerkship Evaluation indicates that Dr. Fernandez was the instructor, and that the clerkship occurred at "Greater Miami Health Education and Training Center" (A134), a hospital which does not exist (A27, A699), whose address is Dr. Fernandez's penthouse office (A157).

Evidence on the record, viewed in the light most favorable to Mr. Dasrath, tends to prove that said Clinical Clerkship Evaluation was fabricated, as respondent's deponent Dr. Fernandez admitted Mr. Dasrath was never enrolled in the Clinical Clerkship course (A26). The respondent's handbook states as follows:

> "Passing the AICM course and USMLE Step 1 are required for continuation into clinical clerkships."

39

A172. Respondent claims that Mr. Dasrath failed the AICM course (A138), and Mr. Dasrath did not sit for the USMLE Step 1 until July 27, 2006 (A176), so Mr. Dasrath could not have been enrolled in a clinical clerkship.

Dr. Fernandez admitted Mr. Dasrath was never enrolled in a clinical clerkship course (A151). Subsequently, Dr. Fernandez, when confronted with his "Clinical Clerkship evaluation", changed his testimony to now claim that AICM was also a clinical clerkship, but then admitted it was neither a core or elective clinical clerkship, but rather "a clinical experience" (A169). Dr. Fernandez is thus claiming that the "Clinical Clerkship evaluation" is part of the failing grade on the AICM course (A169).

This false testimony is refuted by the fact that the Clinical Evaluation Form expressly requires that it "must be returned within 1 month of completion of the rotation." (A134). The AICM course Dr. Fernandez belatedly claims the "Clinical Clerkship evaluation" was purportedly a part of was completed April 7, 2006 (A29, A39), and the allegedly failing grade was reported to Mr. Dasrath on April 22, 2006 (A41, A138), both dates in excess of two months prior to the June 23, 2006 date this "Clinical Clerkship evaluation" form was filled out (A134, A699).

Thus, evidence exists on the record tending to prove that the respondent (1) failed to perform a formal review of the grade upon his

written request, as is expressly required by its handbook; (2) issued a report when it belatedly performed a court ordered review which failed to give notice of the right to a hearing and failed to delineate the procedures to be followed with regard to said hearing, as expressly required by its handbook; (3) de-enrolled Mr. Dasrath, who upon its express approval was sitting for his boards during the 17 week break scheduled by its handbook, for failing to "either be registered for courses and/or registered for the Boards", when the handbook indicates that during the 17 week period "students remain fully enrolled" and with respondent's express approval, Mr. Dasrath was sitting for his boards July 26, 2006.  This evidence raises issues of fact exist as to whether respondent breached "specific promises set forth in a school's bulletins, circulars and *handbooks*, which are material to the student's relationship with the school, [establishing] the existence of an implied contract" and "in several respects, respondent failed to substantially comply with its own procedures, prejudicing [Mr. Dasrath]." Radin, 2005 WL 1214281 at *11; Weidemann, 188 A.D.2d at 975-976, 592 N.Y.S.2d at 101; see Clarke, 1996 WL 609271 at *5; Maas, 94 N.Y.2d at 94-95, 699 N.Y.S.2d at 720, 721 N.E.2d at 970; Keefe, 71 A.D.3d at 570, 897 N.Y.S.2d at 95; Eidlisz, 61 A.D.3d at 475, 876 N.Y.S.2d at 401-402.

Further, the evidence shows that respondent failed or refused to provide Mr. Dasrath with copies of his test papers, obviously relevant to whether or not he actually failed the course. Accordingly, assuming, *arguendo*, that this evidence "might not have been sufficient in itself to defeat summary judgment," "such evidence could support a finding of [a meritorious cause of action] because *a jury might draw a jury might draw an adverse inference based on the defendants' destruction of relevant evidence*." Tucker, 376 Fed.Appx. at 102; see Wood, 2008 WL 5120494 at *2-3; Byrnie, 243 F.3d at 107-108; Kronisch, 150 F.3d at 126-128.

## <u>CONCLUSION</u>

For the foregoing reasons and authorities, Appellant Anand Dasrath respectfully requests that the judgment in this matter be reversed, his breach of contract cause of action be reinstated, the matter be remanded for trial, and costs granted to the Appellant.

Dated:      New York, New York
             August 11, 2011


             COSTELLO & COSTELLO, P.C.


             By: S/_____
                Arnold E. DiJoseph III
             5919 20th Avenue
             Brooklyn, New York 11204
             (718) 331-4600

             *Counsel for Plaintiff/Appellant*
             *Anand Dasrath*

## <u>CERTIFICATE OF COMPLIANCE WITH FRAP 32(a)</u>

1.      This brief complies with the type-volume limitation of Fed. R. App. P.

32(a)(7)(B) because this brief contains 10,389 words, excluding the

parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).


2.      This brief complies with the typeface requirements of Fed. R. App. P.

32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6)

because this brief has been prepared in a proportionally spaced

typeface using Microsoft Word in Times New Roman, 14 point font.


Dated:      New York, New York
            August 11, 2011


            COSTELLO & COSTELLO, P.C.


            By: <u>S/                            </u>
                    Arnold E. DiJoseph III
            5919 20th Avenue
            Brooklyn, New York 11204
            (718) 331-4600

            *Counsel for Plaintiff/Appellant*
            *Anand Dasrath*

SPECIAL APPENDIX

# **Table of Contents**

**Page**

Memorandum and Order of the Honorable Carol Bagley Amon,
   dated May 26, 2011, Appealed From  ............................................   SPA1

Judgment of the United States District Court, Eastern District
   of New York, entered May 26, 2011, Appealed From  .................   SPA14

Notice of Appeal, dated June 21, 2011 ................................................   SPA15

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------x
ANAND DASRATH,

                              Plaintiff,

   -against-

ROSS UNIVERSITY SCHOOL OF MEDICINE,

                              Defendant.
-------------------------------------------------------------------x

NOT FOR PUBLICATION
**MEMORANDUM &
ORDER**
07-CV-2433 (CBA) (RER)

AMON, Chief United States District Judge:

   Anand Dasrath sued Ross University School of medicine, an institution at which he was
once a medical student, and alleged various state and federal causes of action stemming from
Ross's spring 2006 decision to award him a failing grade, to administratively withdraw him from
its degree program, and to revoke its sponsorship of his application to sit for the United States
Medical Licensing Examination, Step One Exam ("USMLE Step 1").

   The only claim left in this case is one for breach of contract. The parties have cross-
moved for summary judgment. Ross's motion is granted.

## BACKGROUND

### 1. Enrollment and AICM Course

   Ross, a foreign corporation, operates a medical school in the West Indies on the island of
Dominica. Ross educates at least some individuals who hope to practice medicine in the United
States, and those individuals, before they may be licensed to practice in the United States, must
successfully complete several qualifying examinations, including the USMLE Step 1 exam.

   One of those individuals is Dasrath, who first enrolled at Ross in May 2004 when he was
forty six years old. From that time, Dasrath was regularly enrolled at Ross, earning credits
towards his medical degree.

At the close of the academic term ending in December 2005, Dasrath had accumulated an academic average of 2.36 over sixty seven credits.  To that point, Dasrath had earned one failing grade, which he earned in a biogenetics course that he originally took during his first semester at Ross.  (Def. S.J. Ex. I.)

Dasrath, in an affidavit filed in connection with the cross motions, says that this grade was originally issued as a B plus, but lowered to an F after the semester break.  (Pl. S.J. Aff. ¶¶ 10–11.)  He states that he discussed this failing grade with his professor, a Dr. Houghton, who "laughed in his face" and told him that she could do nothing about his grade.  (Id. ¶ 12.)  Dasrath subsequently spoke with the head of the Genetics Department, a Dr. Larsen, who told him that he could not assist him because he did not assign the grade.  (Id. ¶ 13.)

Dasrath next took his complaint to the chairman of the Biochemistry Department (of which the Genetics Department is a part), a Dr. Meisenberg, who took him to see a Dr. Desalu, who was in charge of the examination center.  (Id. ¶ 14.)  Dr. Desalu told Dasrath and Dr. Meisenberg that there appeared to be a problem with the grade, but Dasrath says that "by the tone of Dr. Desalu's voice, it became obvious to [Dasrath] that [he] was not going to resolve this issue."  (Id. ¶¶ 15–17.)

In January 2006, at the beginning of Dasrath's fifth semester, Dasrath began taking a course called Advanced Introduction to Clinical Medicine ("AICM"), which was taught that term by Dr. Enrique Fernandez.  (Def. R. 56.1 ¶ 14.)  It is undisputed that Ross students must successfully complete the AICM course before they may sit for the USMLE Step 1 exam.  (Id. ¶ 46; Def. S.J. Ex. D at 13.)

Although there is no evidence in the record on this fact, at oral argument on the cross motions, Ross represented that the Educational Commission for Foreign Medical Graduates, the

2

organization that administers the USMLE Step 1 exam, also requires that students who sit for the exam first pass the AICM course.

Ross students hoping to sit for the USMLE Step 1 exam also must successfully complete the basic sciences curriculum and an exam called the National Board of Medical Exams ("NBME"). (Id.) Dasrath successfully completed the basic sciences curriculum during the final academic term of 2005, and he passed the NBME sometime before March 9, 2006. (Def. R. 56.1 ¶ 47; Pl. S.J. Ex. J.)

Consistent with Ross policy, in March 2006, while he was enrolled in the AICM course, Dasrath applied to sit for the July 27, 2006 USMLE Step 1 exam. (Def. R. 56.1 ¶ 38.) As part of that application, Dasrath asked Ross to certify his application and a Ross associate registrar certified the application on March 20, 2006. (Def. S.J. Ex. G.)

Dasrath subsequently completed the AICM course on April 7, 2006 and was, apparently at some point after April 7, issued what the parties have called a "certificate of completion," which was signed by Dr. Fernandez. (Def. R. 56.1 ¶ 14; Pl. S.J. Ex. 2d I.)

Sometime before April 22, 2006, Dr. Fernandez posted the AICM course grades on a secure website called "eCollege" and emailed his students to let them know that the course grades were posted. According to records that Ross produced during discovery, Dasrath was awarded a failing grade; he had earned only 426.6 of a possible 1,000 points. (Fernandez Aff. ¶ 11; Def. S.J. Ex. A.)

On April 22, 2006, Dasrath emailed Dr. Fernandez about his grade, writing that he saw "a failing grade as [his] final grade" and asking that Dr. Fernandez "review the components of [his] grade." (Def. S.J. Ex. B.)

Dasrath specifically identified four grade components about which he was concerned,

3

including (1) his "Epi/Biostatics grade," which he thought had been remediated to correct his initial failing grade; (2) his final essay, for which he received a score of thirty six percent (Dasrath thought that he may have been marked down for his poor penmanship); (3) his "second case write up," for which he received a C minus; and (4) an extra credit portion of the course for which Dasrath received thirty six of fifty points. (Id.)

Dasrath closed the April 22, 2006 email by noting that he had already passed the NBME, had already moved back to New York from Dominica, and had already begun preparing for the USMLE Step 1 exam. (Id.)

Dasrath and Dr. Fernandez spoke by telephone on April 24, 2006. Dr. Fernandez, who has testified that he memorialized the conversation, avers that he and Dasrath discussed the failing grade and that he advised Dasrath that, as a result of the grade, Dasrath would have to repeat the AICM course. In his affidavit, Dr. Fernandez states that he told Dasrath that he "would need to repeat the AICM course in the semester starting May 22, 2006." (Fernandez Aff. ¶ 17.)

The "memorandum to file" that Dr. Fernandez says he prepared after the telephone conference states that he advised Dasrath that Dasrath would have to repeat the AICM course, that he "may" repeat the course during the academic term beginning May 22, 2006, and that he could choose to begin the AICM course in September 2006. (Def. S.J. Ex. C.)

Dasrath appears to deny that Dr. Fernandez discussed the requirement that he retake the AICM course in the academic term beginning May 22, 2006, although he seems to concede that the telephone conversation occurred.

Sometime before May 5, 2006, Dasrath learned that his USMLE Step 1 application had been rejected because his date of birth had been misreported in some respect. Dasrath

subsequently prepared a new application and asked Ross to certify his application for a second time.  Ross certified that application, as it had the first, on May 5, 2006.  (Def. S.J. Ex. H.)

On May 8, 2006, Dasrath met with Dr. Nancy Perri, Ross's vice president for academic affairs.  Dasrath asked Dr. Perri to investigate his failing AICM grade and to speak with Dr. Fernandez.  Dr. Perri testified that she did this, although she was unable to recall the details of her conversation with Dr. Fernandez.  (Def. R. 56.1 ¶ 24; Perri Dep. at 49.)  Dasrath's grade was not changed.

By letter dated May 15, 2006, Dasrath, who had returned to his home in New York, wrote Ross asking that he be provided a copy of his academic transcript.  (Def. S.J. Ex. I.)  Ross sent Dasrath a copy of his transcript, which did not reflect any grade for the AICM course.

### 2. Administrative Withdrawal and State Court Litigation

Dasrath never registered for, or returned to campus to retake, the AICM course during the academic term beginning May 22, 2006.  There is no evidence that he told anyone at Ross that he wanted to retake the AICM course in the academic term beginning September 2006.

Ross says that, because Dasrath failed to return for the May 22, 2006 term, it decided to administratively withdraw Dasrath from the medical school.  Ross says that this decision was consistent with its internal policies, which state that the registrar "enters an administrative withdrawal when . . . the student does not return to the campus to register for the following semester and attend classes in Week One of a semester."  (Def. S.J. Ex. D at 23.)  Ross regulations provide that all administrative withdrawals are "effective as of the last day [the student] attended classes."  (Id.)

Ross informed Dasrath of the administrative withdrawal by letter dated June 29, 2006, explaining that he had been withdrawn "for failure to register for the May 2006 AICM course."

(Def. S.J. Ex. E.)  The letter further explained that if Dasrath wished to resume his studies at

Ross (then or in the future), he would have to reapply through the admissions office and to

explain the reasons for his withdrawal.  (Id.)

Dasrath did not reapply; instead, through counsel, he filed a lawsuit in New York state

court, alleging breach of contract and seeking to compel Ross to "sponsor" him for the July 27,

2006 USMLE Step 1 exam.  (Def. S.J. Ex. N.)  In support of Dasrath's request for emergency

relief, Dasrath's attorney submitted an affirmation in which he stated that Ross had promised to

sponsor Dasrath for the exam and had, impermissibly, informed Dasrath that it would withdraw

that sponsorship.  He further stated that Dasrath "believes that he should have passed the AICM

course but the Defendant has not provided Plaintiff with his grade for the course."  (Id.)

Although it is not clear just how the state court litigation progressed, Dasrath sat for the

July 27, 2006 USMLE Step 1 exam, notwithstanding the fact that he had not succeeded in

changing his AICM grade, was not enrolled at Ross, and had not successfully compelled Ross to

sponsor him for the examination.  (Def. R. 56.1 ¶ 8.)

The state court suit was dismissed on January 31, 2007 for lack of personal jurisdiction—

Dasrath had not properly served the summons and complaint.  (Def. S.J. Ex. O.)

### 3. This Litigation

On June 15, 2007, Dasrath, through counsel, filed suit in this Court, alleging breach of

contract, fraud, and age discrimination in violation of 42 U.S.C. § 6102 and the New York

Human Rights Law, N.Y. Exec. Law § 296.

On March 31, 2009, the Court adopted in part the report and recommendation of the

Honorable Ramon Reyes, U.S. Magistrate Judge, which recommended that (1) the federal age

discrimination claim be dismissed for failure to exhaust administrative remedies; (2) the fraud

claim be dismissed as inadequately pleaded; (3) the state law discrimination claim be dismissed as inadequately pleaded; and (4) the breach of contract claim be dismissed as inadequately pleaded. The Court adopted all of those recommendations, but it permitted Dasrath leave to re-plead all of the dismissed claims. See Dasrath v. Ross Univ. Sch. of Med., No. 07-CV-2433, 2009 WL 891765 (E.D.N.Y. Mar. 31, 2009).

Dasrath, again through counsel, then filed the currently operative complaint on June 18, 2009. In that complaint, by way of background, he alleged that he "did not receive a grade for the AICM course despite his demand for his grade." (Am. Compl. ¶ 6.) He further alleged that he had been denied the right to inspect school records, including "scantron" sheets that he had submitted in connection with certain unnamed examinations. (Id.) Additionally, he alleged that Dr. Fernandez had advised him that "he received a 94% on the physical exam," which, presumably, was a component of the AICM course. (Id.) He further alleged that on or about June 29, 2006, he was notified that he had been withdrawn from Ross and that, without any warning, his sponsorship to sit for the USMLE Step 1 exam had been revoked. (Id. ¶ 8.) He additionally claimed that "upon information and belief, during Plaintiff's time as a student at Defendant's school of medicine, his grades were changed, withheld, and / or inaccurately reported." (Id. ¶ 10.)

Dasrath again pleaded four claims. The first was for federal age discrimination. He pleaded that "upon information and belief" Ross had excluded him from participation in the medical school, denied him the benefits of that school, harassed him, and "evaluated and treated [him] differently than similarly situated younger students." (Id. ¶ 15.) Dasrath alleged that Ross maintained a policy of discriminating against older students because Ross found it difficult to place older students in hospital training programs after they passed the USMLE Step 1 exam.

(Id. ¶¶ 16–17.)

The second claim alleged breach of contract.  Dasrath alleged that he contracted with

Ross and that the contract required Ross to "accurately record Plaintiff's grades and sponsor

Plaintiff to take the USMLE Step 1 examination."  (Id. ¶ 20.)  He claimed that Ross breached the

contract when it withdrew him from school "without justification and in violation of its own

academic rules and regulations."  (Id. ¶ 22.)  Moreover, Ross breached the contract when it

"without any justification or valid reason withdrew its sponsorship for the USMLE exam after it

had accepted Plaintiff's application and duly certified Plaintiff to take said exam." (Id. ¶ 23.)

The third claim alleged fraud, pleading that (1) on August 14, 2006, Ross falsely stated

that Dasrath had failed the AICM course; (2) by letter dated June 27, 2006 Ross falsely stated

that Dasrath was being withdrawn for failure to register for the May 2006 AICM course; and

(3) Dr. Perri falsely stated that she had reviewed Dasrath's AICM evaluations and that Dasrath

had failed the AICM course.  (Id. ¶¶ 25–27.)  Dasrath pleaded that each of these false statements

was made in furtherance of a scheme to prevent older students from passing the USMLE Step 1

exam.  (Id. ¶ 28.)

The fourth and final claim was for tortious interference with contractual relations, and it

alleged that Ross had interfered with its contract with Dasrath.  (Id. ¶¶ 30–35.)

By way of relief, Dasrath requested money damages as well as an order directing that

Ross reinstate him, sponsor him to sit for the USMLE Step 1 exam, and effectuate the release of

his USMLE Step 1 exam score from the July 2006 sitting.

On May 7, 2010, on the record at oral argument, the Court granted in part Ross's second

motion to dismiss and dismissed every claim except the claim for breach of contract.  After the

parties conducted discovery on the contract claim, they filed the cross motions for summary

**SPA9**

judgment that are the subject of this order.

## DISCUSSION

The parties have not clearly addressed the issue, but both treat New York law as governing this dispute.  The Court accepts that agreement.  See Babiker v. Ross Univ. Sch. of Med., No. 98 Civ. 1429, 2000 WL 666342, at *6 n.9 (S.D.N.Y. May 19, 2000), citing Am. Fuel Corp. v. Utah Energy Dev. Co., 122 F.3d 130, 134 (2d Cir. 1997) ("where the parties have agreed to the application of the forum law, that consent concludes the choice of law inquiry").

The parties also agree that, "[u]nder New York law, a student can sue his school for breach of contract."  Babiker, 2000 WL 666342, at *6; see also Clarke v. Trs. of Columbia Univ., No. 95 Civ. 10627, 1996 WL 609271, at *5 (S.D.N.Y. Oct. 23, 1996) ("New York courts have suggested that a student can sue a school for breach of contract.").  "According to this line of cases, when a student is admitted to a school, an implied contract arises between the student and the school."  Clarke, 1996 WL 609271, at *5 (citing Olsson v. Bd. of Higher Educ., 49 N.Y.2d 408, 414 (1980)); see also Gally v. Columbia Univ., 22 F. Supp. 2d 199, 206 (S.D.N.Y. 1998) ("When a student enrolls at a university, an implied contract arises . . . .").

"The terms of the implied contract are supplied by the bulletins, circulars and regulations made available to the student."  Gally, 22 F. Supp. 2d at 206; see also Garg v. Albert Einstein Coll. of Med., 747 F. Supp. 231, 236 (S.D.N.Y. 1996) ("New York courts have reviewed academic decisions where the plaintiff has alleged that the school officials failed to adhere to the school's regulations or policies and have therefore breached a contract entered into with the students."); Vought v. Teachers Coll., Columbia Univ., 127 A.D.2d 654, 655 (2d Dep't 1987).

"Implicit in this contract is that the university must act in good faith in dealing with the student."  Id.  "Also implicit is that the student must fulfill her end of the bargain by satisfying

9

the university's academic requirements and complying with its procedures . . . ." Id.; see also

Keles v. New York Univ., No. 91 Civ. 7457, 1994 WL 119525, at *5 (S.D.N.Y. Apr. 6, 1994)

("by not passing the examinations at the proper stage of his studies, Keles did not fulfill the

requirements of the 1983 Guidelines, and thus, breached his part of the contract").

It is worth stressing that "the mere allegation of mistreatment without the identification of

a specific breached promise or obligation does not state a claim on which relief can be granted."

Gally, 22 F. Supp. 2d at 207.  That is, "application of contract principles to the student-university

relationship does not provide judicial review for every disgruntled student."  Id.

Moreover, as the parties agree, attacks on "the substantive evaluation of . . . academic

performance . . . are beyond judicial review." Benson v. Trs. of Columbia Univ., 215 A.D.2d

255, 255 (1st Dep't 1995); see also Gertler v. Goodgold, 107 A.D.2d 481, 485 (1st Dep't 1985)

("since the academic and administrative decisions of education institutions involve the exercise

of subjective professional judgment, public policy compels a restraint which removes such

determinations from judicial scrutiny").

Although his precise theory of the case is not entirely clear, Dasrath clearly contends that

Ross had a contractual duty not to withdraw its sponsorship of his application to sit for the

USMLE Step 1 exam that was administered in July 2006.  His papers and representations at oral

argument suggest that this obligation stemmed from the fact of his enrollment at, and payment of

tuition to, Ross.

Ross contends that it honored this obligation because, consistent with its regulations, it

withdrew its sponsorship of Dasrath's application only after he failed the AICM course.  At oral

argument on the pending motions, Dasrath agreed that Ross had the right to do what it did if he

failed the AICM course and he conceded that his contract claim depends on the truth of his

allegation that he passed the course.

Recognizing that, under New York law, he cannot challenge the academic judgment that he did not satisfactorily complete the requirements of the AICM course, Dasrath further conceded that his contract claim ultimately depends on the truth of his allegation that Ross "fabricated" his failing grade. That is, Dasrath concedes that, on his theory of the case, if after trial no reasonable jury could conclude that his AICM grade was fabricated, he cannot prevail.

Dasrath's motion papers are not helpful, but, at oral argument, when asked to identify the record evidence that supports his claim of grade fabrication, he said that he is relying on three pieces of evidence that he believes would permit a reasonable jury to find that his grade was fabricated: (1) the March 2006 certification to sit for the USMLE Step 1 exam; (2) the May 2006 certification to sit for the USMLE Step 1 exam; and (3) the undated "certificate of completion" for the AICM course. These forms, he contends, are evidence that Ross at various times took the position that he had passed the AICM course, which in turn is evidence of fabrication.

No reasonable jury could rely on the application certifications as evidence that, in March or May 2006, Ross took the position that Dasrath had passed the AICM course. The portion of the application that the parties have provided the Court (i.e. the certification page) shows only that a Ross associate registrar certified that certain representations—including representations regarding medical school attendance dates and student status—are true and that Dasrath was at the time of certification enrolled at Ross. (Def. S.J. Exs. G, H.) The portion of the application that is in the record does not show that the associate registrar certified that Dasrath had passed the AICM course.[1]

_____

[1] Although the copies of the certification page provided the Court are of poor quality, the registrar appears also to have certified that unspecified representations in "Section 23" of the application are accurate. Section 23 is not in the record. But Dasrath has not suggested, or offered any evidence, that Section 23, or some other portion of the application not in evidence, would show that Ross certified that he passed the AICM course. And Ross has

It is not even clear at all how the registrar could have certified that Dasrath passed the course. She certified the first application in March 2006, which is before Dasrath had completed or received a grade in the AICM course. That seems to be consistent with practice: students apply for the USMLE Step 1 exam while the final prerequisite course is in process on the assumption that they will pass that final course.

Significantly, it is undisputed that, but for an error in the application, March 2006 is the only time that any Ross official would have certified the application. The fact that a registrar later certified a second application after Dasrath had been told of his failing grade, but before that grade had been officially made a part of his transcript, does not lessen the significance of this fact.

In sum, there is no reasonable view of the evidence on which the March and May 2006 certifications tend to prove that Ross ever took the position that Dasrath had passed the AICM course.

The certificate of completion also is not evidence that Ross thought that Dasrath had passed the AICM course. That one-page form certification, signed by Dr. Fernandez, includes blanks in which to enter student name, number of weeks, name of rotation, and hospital. The form, as completed, states that Dasrath completed twelve weeks in the AICM at Greater Miami Health Education and Training Center. (Pl. S.J. Ex. 2d I.) The certificate says nothing at all about Dasrath's performance in the course.

Dasrath has not explained how this form shows that Dr. Fernandez at some point took the position that Dasrath had passed the AICM course. He has not explained, or identified evidence in the record that explains, the purpose of the form, which purpose might show Dr. Fernandez's belief that Dasrath passed. The only evidence in the record that attempts to explain the form is a

affirmatively represented that its certification did not certify that fact.

two-page excerpt of Dr. Fernandez's deposition in which he testifies unhelpfully that the "document goes to the registrar." (Id.)

The Court cannot see how any reasonable jury could rely on this form as evidence that Dr. Fernandez awarded Dasrath a passing grade in the AICM course, presumably (the form is not dated) at some point before he decided to take the position that Dasrath had earned a failing grade.

In sum, Dasrath's contract claim, as he has explained it to the court, depends on his proving at trial that Ross fabricated his failing grade in the AICM course, and Dasrath has not offered evidence sufficient to create a triable issue of fact with respect to fabrication.

## CONCLUSION

For the reasons stated, the defendant's motion for summary judgment is granted.  The plaintiff's motion for summary judgment is denied.

The Clerk of Court is directed to enter judgment accordingly and to close this case.

SO ORDERED.

Dated: Brooklyn, New York
       May 26, 2011

                                         _____/s/_____
                                              Carol Bagley Amon
                                          United States District Judge

SPA14

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------------X
ANAND DASRATH,

                              Plaintiff,

   -against-

ROSS UNIVERSITY SCHOOL OF MEDICINE,

                             Defendant.

----------------------------------------------------------------X

JUDGMENT
07-CV-2433 (CBA)

FILED
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y

★ MAY 2 6 2011 ☆

BROOKLYN OFFICE

      A Memorandum and Order of Honorable Carol Bagley Amon, United States District Judge, having been filed on May 26, 2011, granting the defendant's motion for summary judgment; and denying the plaintiff's motion for summary judgment; it is

      ORDERED and ADJUDGED that plaintiff take nothing of the defendant; that the defendant's motion for summary judgment is granted; and that the plaintiff's motion for summary judgment is denied.


Dated: Brooklyn, New York
       May 26, 2011

                          s/RCH

                        ROBERT C. HEINEMANN
                        Clerk of Court

# SPA15

## NOTICE OF APPEAL

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## UNITED STATES DISTRICT COURT
## FOR THE
## EASTERN DISTRICT OF NEW YORK

_____X

ANAND DASRATH

        Plaintiff(s),                      **NOTICE OF APPEAL**

   -against-                         Docket NO: 07-CV-2433

ROSS UNIVERSITY SCHOOL OF
MEDICINE,

        Defendant(s).

_____X

      Notice is hereby given that, Plaintiff, ANAND DASRATH hereby appeals to the United States Court of Appeals for the Second Circuit from the decision of Honorable Carol Bagely Amon dated May 26, 2011 denying Plaintiffs Motion for Summary Judgment for a claim for Breach of Contract against the Defendants, ROSS UNIVERSITY SCHOOL OF MEDICINE and entered in this action on the **26**<sup>th</sup> day of **May, 2011.**

                                    **COSTELLO & COSTELLO, P.C.**
                                    **BY: JOSEPH R. COSTELLO, ESQ.**
                                    Attorney for Plaintiff
                                    5919 20th Avenue
                                    Brooklyn, New York 11204
                                    (718) 331-4600
                                    File no: 6970

Dated: Brooklyn, New York
       June 21, 2011